## UNITED STATES v. TRACY.

Circuit Court of Appeals, Ninth Circuit.
October 15, 1928.

No. 5526.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash. (William Wolff Smith, Gen. Counsel, and C. L. Dawson, Atty., U. S. Veterans' Bureau, both of Washington, D. C., and Lester E. Pope, Regional Atty., U. S. Veterans' Bureau, of Seattle, Wash., of counsel), for the United States.

W. G. Beardslee, of Seattle, Wash., for appellee.

Before RUDKIN, DIETRICH, and HUNT, Circuit Judges.

DIETRICH, Circuit Judge. The United States appeals from a judgment against it in favor of Charles Tracy upon an alleged $10,000 war risk insurance contract.

At the time he filed his complaint Tracy was, and for some time prior thereto he had been, suffering from mental disorders and was under guardianship; discrepancies between his pleading and the proofs, which otherwise might be ground for criticism, we are therefore inclined to disregard. From the record as a whole we gather the following facts:

Tracy enlisted in the naval service on April 24, 1917. Contrary to the representation he then made, that he had had no prior service in the navy, it turned out that in May, 1907, while in the service under the name of John Gallen, he had deserted from the navy, and in October of the same year, while serving under the name of John Culley, he had again deserted, and that under both enlistments he had received pay and allowances. In a court-martial proceeding upon a charge of fraudulent enlistment he was, on November 23, 1917 (following a plea of guilty), sentenced to be confined for the period of one year, "then to be dishonorably discharged, * * * and to suffer all the other accessories of said sentence as prescribed by section 349, Naval Courts and Boards."

Pursuant to the judgment he was incarcerated, and on October 19, 1918, was dishonorably discharged from the naval service. In the meantime, on February 8, 1918, while he was in prison under this sentence, he executed an application for war risk insurance in the amount of $10,000. The premium on such a policy approximated $7.70 per month, and by his application Tracy expressly authorized "the necessary monthly deduction" from his pay, or, if that was insufficient, "from any deposit with the United States, in payment of the premiums as they become due, unless they be otherwise paid." It is not contended that at any time he had such deposit, and under section 349 of the Naval Courts and Boards he was not entitled to pay or allowances while he was a prisoner, other than at the rate of $3 per month. After his dishonorable discharge on October 19, 1918, he was not again in the naval service until October 21, 1920. From his re-enlistment on that date he was honorably discharged on July 14, 1921, but during the period he did not apply for, nor was he granted, war risk insurance.

In his complaint plaintiff alleges that in November, 1918, while he was in the service, he was totally and permanently disabled by a fall, from which he suffered a fractured skull, resulting in the impairment of his nervous system and his mental capacity.

At the close of the evidence defendant moved for a directed verdict in its favor, upon the ground, among others, that plaintiff had failed to make a sufficient showing to go to the jury that at any time, when and if he became disabled, was the contract of insurance in effect. In brief the government's contention was and is that he did not show that he had paid any of the required monthly premiums, and that, if it can be said the contract ever went into effect at all, it lapsed almost immediately by reason of such default.

In plaintiff's jumbled testimony may be found expressions which, if isolated, are to the effect that he paid premiums; but, if we take it as a whole, and consider that he was unable to furnish any written evidence,

or to give time or place or mode of payment, or to state to whom payment was made, or to point out any independent source of funds, we conclude that he intended to claim only that his obligations were taken care of by deductions from his pay under the authorization of the provision in his application hereinbefore referred to. Such apparently was the construction put on the record by the court below, and no other view seems reasonable. But, as has already been stated, such deductions could not have been made while he was in prison, for during that period he was entitled to only $3 per month, and even that amount, as we understand his testimony, was paid to him without deduction. And from October, 1918, when he was discharged from prison, to October, 1920, he was not in the service at all. The insurance, therefore, lapsed, and there is no evidence that it was ever reinstated, or that he ever applied to have it reinstated.

As shown by the record, the court sent the issue to the jury upon the basis of a letter issuing from the United States Veterans' Bureau at Washington. This writing appears to be a form letter upon stationery of the bureau, with the rubber stamp signature of C. A. Pennington, Assistant Director, Insurance Division. It bears date June 26, 1923, and is addressed to plaintiff's guardian, George Miller. It is to be assumed that it was sent out in response to some inquiry, oral or written, made by Miller; but it does not so recite. For the most part it is a form, with a few blank spaces for the entry of name, dates, and amounts, and in so far as material it is as follows:

"Your attention is called to the status of insurance in the above-cited [Tracy] case. Mr. Tracy was granted United States government term insurance in the amount of $10,-000, effective February 8, 1918. This insurance lapsed for nonpayment of premium due August 1, 1921."

There follows a statement at some length of conditions for reinstatement, with instructions touching necessary procedure. Before introducing in evidence the letter, which was received over defendant's objection, plaintiff called as a witness one Louis F. Sassel, who had been an employee in the Insurance Division of the Veterans' Bureau at Washington continuously since 1919. He testified that at the date of the letter Mr. Pennington was in charge of the Insurance Division, that it bore a facsimile of his signature, and that undoubtedly it was sent out by the bureau. The form, he explained, was prepared under Pennington's direction, and with his facsimile signature upon them copies were left in the office for use by typists and clerks. From his experience in the office he was of the opinion that Mr. Pennington had never seen this particular letter. The typists, he testified, made the computations from the first information at hand, and, filling in the blanks, sent out the letters. If an inquiry came as to the status of a policy, giving the requisite data, the computation was based thereon. If the inquiry failed to give the data, resort would have to be made to the office records. In 1923, he stated, innumerable letters were received in regard to reinstatement of insurance.

"If you wrote in and said you wanted information about reinstating your insurance, that you applied for in February, 1918, and that you were discharged in July, 1921, and paid your premium on it while you were in the service, the typist would take the information, assuming it to be correct, and base a calculation on that. If you wrote in and said you wanted to know how much it would cost you to reinstate your insurance, and gave no information, then, in order to answer, it would take considerable time to get the record, and it would be procured and the answer furnished. A typist is not authorized to give any information as to things that might be misleading, but they do it sometimes."

When recalled as a witness for the defendant, he testified that he had made a search of the records, and they failed to disclose that at any time, by deduction or otherwise, premiums had ever been paid upon plaintiff's insurance.

We need not decide whether, under the practice thus outlined, such a letter purporting to advise concerning the contents of an office record would be competent evidence of the record. Such is not the character of this letter. Both the statement that "Mr. Tracy was granted United States government term insurance in the amount of $10,-000, effective February 8, 1918," and the further statement that "this insurance lapsed for nonpayment of premium due August 1, 1921," involve questions of law as well as of fact. The letter is incompetent to establish the correctness of such conclusions; the interests of the government cannot thus be put in jeopardy. Nor does the vindication of plaintiff's rights require such a rule. If the typist's deductions were based upon record facts, the records are available to the plaintiff. His application for insurance was produced and put in evidence by the government. If independently he paid a premium and cannot produce a check or receipt, or other

memorandum, he should be able to testify where and when and through what channel payment was made. If, as he contends, his obligations were or should have been discharged by deductions from what was due him from the government, in pay or on some other account, the fact could be shown, either directly or circumstantially, by the records of his service. He does not contend that he ever made application for reinstatement of the lapsed insurance, and if, upon the records, such reinstatement was effected by operation of law, the records are available to him. Such records, it may be added, as have been produced by the government, are opposed to plaintiff's contention, and scarcely leave room for doubt that whoever wrote and sent out the letter was either ignorant of the facts or ill-advised touching the law. If there are other records of a contrary import, plaintiff may require their production.

Deeming the letter to be incompetent for the purpose for which it was received, we must hold that it was error to deny defendant's motion for a directed verdict, and accordingly the judgment is reversed, with directions for further proceedings not inconsistent herewith.